# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GREGORY J. PARSEGHIAN as trustee of THE GREGORY J. PARSEGHIAN REVOCABLE TRUST and CHRISTINE M. PARSEGHIAN as trustee of THE CHRISTINE M. PARSEGHIAN REVOCABLE TRUST,

Plaintiffs,

v.

FREQUENCY THERAPEUTICS, INC., DAVID LUCCHINO, COMPUTERSHARE INC., and COMPUTERSHARE TRUST COMPANY, N.A.,

Defendants.

C.A. No. 2021-0551-PAF

## MEMORANDUM OPINION

Date Submitted: March 23, 2022
Date Decided: June 21, 2022

Samuel T. Hirzel, II, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Adam C. Ford, Matthew A. Ford, FORD O'BRIEN, LLP, New York, New York; *Attorneys for Plaintiffs Gregory J. Parseghian as Trustee of The Gregory J. Parseghian Revocable Trust and Christine M. Parseghian as Trustee of The Christine M. Parseghian Revocable Trust.*

Elena C. Norman, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Deborah S. Birnbach, Jennifer Burns Luz, Matthew T. White, GOODWIN PROCTOR LLP, Boston, Massachusetts; *Attorneys for Defendants Frequency Therapeutics, Inc. and David Lucchino.*

Kevin R. Shannon, Jaclyn C. Levy, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Seth Goldman, Jacob H. Hupart, MINTZ,

LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C., New York, New York; *Attorneys for Defendants Computershare Inc. and Computershare Trust Company, N.A.*

**FIORAVANTI, Vice Chancellor**

In early 2021, two related stockholders of Frequency Therapeutics, Inc. ("Frequency" or the "Company") decided to sell their shares in the Company amid a rising stock price. The stockholders and their broker encountered difficulty in persuading the Company's stock transfer agent to transfer their shares to their brokerage account due to what the transfer agent represented as inconsistencies between the description of the accounts on the transfer agent's records and those of the broker. The shares were finally transferred six weeks after the stockholders initiated their efforts to transfer and sell the stock. Unfortunately for the stockholders, the Company issued negative news on the day before the shares were transferred, causing a one-day drop in market price from $36.29 to $7.99 per share.

The plaintiffs have asserted a laundry list of claims and legal theories, including that the Company's Chief Executive Officer ("CEO") breached his fiduciary duty to the plaintiffs by causing the stock transfer agent to block plaintiffs' transfer requests so that the CEO could profit from making his own sales in the market. As the theory goes, the CEO probably knew about the negative corporate news while he was selling stock during the time that the plaintiffs were unable to transfer and sell their own shares.

The fiduciary duty claim has all the flavor of an insider trading claim under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949). But the plaintiffs insist that is not their claim. Instead, the plaintiffs maintain that they are asserting a direct

fiduciary duty claim against the CEO for blocking their stock transfer while profiting on his own stock sales ahead of announcing bad news. The breach of fiduciary duty claim fails because it is entirely conclusory with no supporting facts. There are no allegations that this CEO of a publicly traded company had any communications with the transfer agent about the plaintiffs' shares. Indeed, there are no allegations that the CEO knew that the plaintiffs had sought to sell their shares, let alone any act on the CEO's part that could lead to a reasonable inference that he stymied the plaintiffs' stock transfer.

The plaintiffs' remaining claims assert various theories to find the Company or the transfer agent liable for the damages that the plaintiffs allegedly suffered due to the delay in effecting the transfer of their shares. The problem for the plaintiffs is that the court lacks subject matter jurisdiction over the remaining claims. Both plaintiffs and defendants want these claims litigated in this court. But this court is a court of limited jurisdiction. The court is duty bound to raise the issue of subject matter jurisdiction on its own. The court has done so here, and the parties have not demonstrated that the remaining claims are anything other than legal theories designed to obtain a judgment for money damages. Although the court could, in the exercise of discretion, retain jurisdiction under the clean-up doctrine, the court declines to do so. This case is in its embryonic stages. Now that the only claim for which the court had jurisdiction is dismissed at the pleadings stage, it is appropriate

2

to decline jurisdiction under the clean-up doctrine and to allow plaintiffs to refile their remaining claims in the Superior Court. Accordingly, Count II is dismissed for failure to state a claim upon which relief can be granted. Counts I and III–VI are dismissed for lack of subject matter jurisdiction.

## I.  BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the operative complaint and documents integral thereto or otherwise subject to judicial notice.

### A.  Factual History

#### 1.  The Parties

The plaintiffs in this action are two trusts, The Gregory J. Parseghian Revocable Trust and The Christine M. Parseghian Revocable Trust (collectively the "Trusts" and "Plaintiffs").[1] Gregory J. Parseghian and Christine M. Parseghian are the respective Grantors and Trustees of these trusts.[2] The Trusts are purported stockholders of Frequency.[3] The Company is a Delaware corporation with a principle place of business in Massachusetts.[4] Defendant David Lucchino ("Lucchino") is a co-founder, CEO, and director of Frequency.[5] Defendant

---

[1] Compl. ¶¶ 15–16.

[2] *Id.*

[3] *Id.* ¶ 1.

[4] *Id.* ¶ 18.

[5] *Id.* ¶ 22.

Computershare, Inc. and its wholly owned subsidiary, Defendant Computershare Trust Company N.A., work together as the Company's transfer agent (collectively "Computershare").[6]  Frequency, Lucchino, and Computershare are herein referred to as the "Defendants."

### 2. The Trusts' Investment in Frequency

In March 2017, the Trusts purchased 333,333 shares of Frequency Preferred Stock Series A.[7]  On October 9, 2017, the Trusts purchased another 149,530 Frequency shares.[8] For each of these investments, the purchased shares were divided equally between the Trusts.[9]  On October 3, 2019, Frequency commenced its initial public offering ("IPO") on the Nasdaq Global Select Market.[10]  In conjunction with the IPO, Frequency's Series A preferred stock was converted into common stock at a ratio of approximately 6.7 to 1.[11]  As a result, the Trusts' 482,863 shares of Series A preferred were converted to 71,688 shares of common stock.[12]

---

[6] *Id.* ¶¶ 19–20.

[7] *Id.* ¶ 24.

[8] *Id.* ¶ 26

[9] *Id.* ¶¶ 25, 27

[10] *Id.* ¶ 30.

[11] *Id.*

[12] *Id.*

### 3.     Frequency

Frequency is a biotechnology company focused on developing treatments that activate targeted regenerative cells in the human body.[13]  At all times relevant to this matter, Frequency has been developing one such treatment, "FX-322," to combat sensorineural hearing loss ("SNHL"), a condition that includes presbycusis (the medical name for age-related hearing loss).[14]

Prior to its public offering, Frequency hired Computershare to provide investor services and act as its corporate transfer agent.[15]   According to Computershare's website, it acts as the "global financial record keeper for 16,000 private and public companies."[16]

On September 13, 2020, Frequency revealed positive results from a Phase 1/2 study of FX-322.[17]  Specifically, these results indicated that FX-322 may improve hearing for up to 21 months for patients with SNHL.[18]  Following this news, Frequency's share price rose from $18.91 to $22.43.[19]  On September 22, 2020,

---

[13] *Id.* ¶ 21.
[14] *Id.*
[15] *Id.* ¶ 33.
[16] *Id.* ¶ 20.
[17] *Id.* ¶ 35.
[18] *Id.* ¶¶ 35–36.
[19] *Id.* ¶ 51.

Frequency announced that it had completed enrollment for a Phase 2a study.[20] On October 29, 2020, Frequency issued a press release summarizing FX-322 clinical studies, announcing a plan "to provide a complete analysis of day-90 Phase 2a study data late in Q1 2021," and setting milestones for completing aspects of the study and announcing results.[21] Following this press release, Frequency's stock price "began to steadily climb."[22]

On January 5, 2021, Frequency announced that it would be presenting a review of its business and pipeline at the 39th Annual J.P. Morgan Healthcare Conference later that month.[23] Plaintiffs believe January 6, 2021, or at the latest January 21, 2021, was "day-90" for the FX-322 Phase 2a study.[24] On January 13, 2021, Lucchino presented at the 39th Annual J.P. Morgan Healthcare Conference.[25] The complaint contains no allegations as to what Lucchino said during his presentation. The complaint speculates that "[a]t this time, Lucchino was possibly aware that the results of the Phase 2a study would not be positive."[26] On January

---

[20] *Id.* ¶ 37.

[21] *Id.* ¶ 39.

[22] *Id.* ¶ 52.

[23] *Id.* ¶ 40.

[24] *Id.* ¶ 41.

[25] *Id.* ¶ 42.

[26] *Id.*

6

19, 2021, Frequency's Chief Development Officer positively compared the ongoing Phase 2a study to a prior Phase 1 study in an investor conference call.[27] On January 27, 2021, J.P. Morgan analyst Anupan Rama lifted his target price for Frequency stock from $27 to $56.[28]

### 4. Plaintiffs Decide to Sell Their Stock in Early 2021

By February 1, 2021, Frequency's stock was trading at $44.17.[29] Around this time, the Parseghians decided to sell most or all of their holdings in Frequency.[30] On February 2, 2021, the Parseghians instructed their broker at J.P. Morgan, James Jacob, to initiate transfer requests to Computershare on behalf of the Trusts to transfer their Frequency shares to their brokerage accounts at J.P. Morgan.[31] Computershare informed Jacob that inconsistencies existed between the account details listed on J.P. Morgan's system and Computershare's system and those inconsistencies would prevent any transfer requests from being approved.[32] Plaintiffs allege that these inconsistencies are the result of an error that occurred during the migration of Frequency's pre-IPO investor data over to Computershare's

---

[27] *Id.* ¶ 43.

[28] *Id.* ¶ 45.

[29] *Id.* ¶ 54.

[30] *Id.* ¶ 70.

[31] *Id.* ¶¶ 70, 74.

[32] *Id.* ¶¶ 75–77.

systems in 2020.[33] According to Plaintiffs, Computershare erroneously listed Gregory Parseghian as the trustee of both Trusts.[34] During its communications with Plaintiffs' broker in early 2021, Computershare identified an additional issue – the Trusts' J.P. Morgan accounts reflected a "transfer on death" ("TOD") notation not present on Computershare's system.[35]

On February 10, 2021, Jacob recommended to the Parseghians that they create new J.P. Morgan accounts to match the account details on Computershare's system.[36] J.P. Morgan created the new accounts three weeks later, on or about March 5, 2021.[37] Jacob then submitted a transfer request to Computershare.[38]

At or around the time that the Parseghians decided to sell their Frequency shares, Lucchino coincidentally had been selling some of his Frequency shares pursuant to a Rule 10b5-1 trading plan.[39] Lucchino is alleged to have done the following:

---

[33] *Id.* ¶¶ 34, 75–76.

[34] *Id.*

[35] *Id.* ¶ 77.

[36] *Id.* ¶ 78.

[37] *Id.* ¶ 80.

[38] *Id.*

[39] *Id.* ¶¶ 3, 55, 57–58, 60, 63. Rule 10b5-1 of the Securities Exchange Act of 1934 "permits insiders to implement written, pre-arranged stock trading plans when they are not in possession of material non-public information. Generally speaking, 10b5-1 plans offer a safe harbor for corporate insiders to sell stock by ceding trading authority to third parties

- On February 1, 2021, Lucchino converted preferred shares into 33,102 shares of common stock and sold them for a gain of $1,406,032.94.[40]

- On February 2, 2021, Lucchino converted preferred shares into 5,518 shares of common stock and sold them for a gain of $250,959.82.[41]

- On February 3, 2021, Lucchino converted preferred shares into 11,306 shares of common stock and sold them for a gain of $531,273.04.[42]

- On February 8, 2021, Lucchino converted preferred shares into 16,554 shares of common stock and sold them for a gain of $900,372.06.[43]

- On March 1, 2021, Lucchino converted preferred shares into 9,416 shares of common stock and sold them for a gain of $469,028.26.[44]

After these February and March sales, Lucchino continued to own 308,086 shares of Frequency common stock.[45]

---

with exclusive discretion to execute trades under certain pre-determined parameters." *Laborers Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. June 14, 2016) (footnote omitted), *aff'd*, 155 A.3d 1283 (Del. 2017).

[40] Compl. ¶ 55.

[41] *Id.* ¶ 57.

[42] *Id.* ¶ 58.

[43] *Id.* ¶ 60.

[44] *Id.* ¶ 63.

[45] Frequency Therapeutics, Inc., Statement of Changes in Beneficial Ownership (Form 4) (March 2, 2021). *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) ("This Court has recognized that, in acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings to ascertain facts appropriate for judicial notice under [Delaware Rule of Evidence] 201." (internal quotations omitted)).

On March 23, 2021, Frequency issued a press release announcing that interim results from its Phase 2a study "did not demonstrate improvements in hearing measures."[46] Frequency's stock closed that day at $7.99 per share,[47] compared to the prior day's close at $36.29 per share.[48] The next morning, Computershare completed the Parseghians' requested transfers of stock to their J.P. Morgan accounts.[49]

Based on the closing market prices, the value of the Trusts' 71,688 shares on March 24, 2021 was $572,787.12, as compared to $3,441,024 on February 3, 2021, $2,679,697.40 on March 5, 2021, and $4,184,425.50 on the intraday trading zenith within the period of February 3, 2021 to March 23, 2021.[50]

## B. Procedural History

On June 23, 2021, Plaintiffs filed their six-count Verified Complaint.[51] The next day, Plaintiffs filed a corrected Verified Complaint (the "Complaint").[52] Count I of the Complaint asserts a claim for conversion against Frequency and

---

[46] Compl. ¶ 67.

[47] *Id.* ¶ 68.

[48] *Id.* ¶ 66.

[49] *Id.* ¶ 82.

[50] *Id.* ¶¶ 83–85.

[51] Dkt. 1.

[52] Dkt. 3. *See* Dkt. 2 (letter from Plaintiffs' counsel explaining the non-substantive error remedied in the second-filed complaint).

Computershare, jointly and severally, for their wrongful exercise of dominion over the Trusts' shares from February 3, 2021 until March 23, 2021. In the alternative to Count I, Count III seeks the imposition of a constructive trust against Frequency on the basis of unjust enrichment. Plaintiffs allege that the Trusts' inability to sell shares was an impoverishment which benefitted and enriched Frequency by causing its stock prices to become artificially high. The Complaint does not allege what Plaintiffs seek to be placed in the constructive trust. Instead, as discussed below, the only remedy sought is money damages. Count II alleges that Lucchino breached his fiduciary duty of loyalty by taking "actions to prevent the Trusts from selling their shares at a time when he was personally selling shares under a 10b-5-1 plan, [which] served to benefit him personally."[53] Counts IV–VI are negligence claims asserted against Computershare in the alternative to Counts I–III. Count IV alleges that Computershare's failure to transfer the Trusts' shares upon demand on February 3, 2021 creates an inference of negligence. Count V asserts the same for demands "on or about" February 10, 2021,[54] and Count VI asserts the same for demands "on or about" March 5, 2021.[55] The only form of relief sought is money damages.[56]

---

[53] Compl. ¶ 109.

[54] *Id.* ¶¶ 127–30.

[55] *Id.* ¶¶ 131–34.

[56] *Id.* Wherefore Clause ¶¶ A–B.

On July 19, 2021, Frequency and Lucchino jointly filed a motion to dismiss for failure to state a claim and failure to plead demand futility.[57] On October 6, 2021, Computershare filed a motion to dismiss the counts against it for failure to state a claim.[58] On March 1, 2022, the court heard argument on the Defendants' motions to dismiss.[59] During that hearing, the court questioned whether it had subject matter jurisdiction over any claim other than the breach of fiduciary duty claim against Lucchino.[60] At the close of hearing, the court requested supplemental briefing addressing the jurisdictional issues.[61] The parties filed supplemental submissions, each maintaining that this court has subject matter jurisdiction over this case because Counts I–III are equitable in nature and the court can assert jurisdiction over the remaining claims under the clean-up doctrine.[62]

## II. ANALYSIS

The Court of Chancery is "proudly a court of limited subject matter jurisdiction." *Crown Castle Fiber LLC v. City of Wilmington*, 2021 WL 2838425, at *1 (Del. Ch. July 8, 2021); *see also Perlman v. Vox Media, Inc.*, 2019 WL

---

[57] Dkt. 7.

[58] Dkt. 22.

[59] Dkt. 43.

[60] Dkt. 49 (Mar. 1, 2022 Hrg. Tr.) ("Transcript") at 13–14, 31–32, 50–51.

[61] Transcript at 50; *see also* Dkt. 45.

[62] Dkt. 46 ("Pls.' Supp. Memo."); Dkt. 50 ("Defs.' Supp. Memo.").

2647520, at *4 (Del. Ch. June 27, 2019) (same); *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995) (explaining that the Court of Chancery has "only that limited jurisdiction that the Court of Chancery in England possessed at the time of the American Revolution, or such jurisdiction as has been conferred upon it by the Delaware General Assembly."). The court may acquire subject matter jurisdiction in any one of three ways: (i) the assertion of equitable claims; (ii) requests for equitable relief; and (iii) by statutory grant. *Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (footnotes omitted). Plaintiffs bear the burden of establishing that subject matter jurisdiction exists,[63] and this question is "so crucial that it may be raised at any time" by the court or the parties. *In re Coinmint, LLC*, 261 A.3d 867, 904 (Del. Ch. 2021) (quoting *Envo, Inc. v. Walters*, 2009 WL 5173807, at *4 n.10 (Del. Ch. Dec. 30, 2009)). In fact, this court has a "duty to determine" whether it has subject matter jurisdiction over the claims. *Id.*

In their supplemental submission, Plaintiffs argue that Counts I–III invoke subject matter jurisdiction.[64] Specifically, they maintain that the court has subject

---

[63] *See, e.g., Legent Grp., LLC v. Axos Fin., Inc.*, 2021 WL 73854, at *2 (Del. Ch. Jan. 8, 2021) (collecting cases); *Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003) (citing *Wilmington Fraternal Order of Police Lodge No. 1 v. Bostrom*, 1999 WL 39546, at *4 (Del. Ch. Jan. 22, 1999)).

[64] Pls.' Supp. Memo. at 2–4.

13

matter jurisdiction because Counts I and III seek equitable remedies and Count II asserts an equitable claim.[65] The parties concede that Counts IV–VI are claims for negligence, which are legal in nature.[66] Nevertheless, the parties urge the court to exercise jurisdiction under the clean-up doctrine.[67]

Under the clean-up doctrine, "if a controversy is vested with equitable features which would support Chancery jurisdiction of at least a part of the controversy, then the Chancellor has discretion to resolve the remaining portions of the controversy as well." *Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 (Del. Ch. 1978) (internal quotations omitted), *aff'd*, 407 A.2d 533 (Del. 1979). "Reliance on the cleanup doctrine is a matter for the Court's discretion." *CCC Atl., LLC v. Grey*, 2014 WL 4217211, at *1 (Del. Ch. Aug. 25, 2014). Therefore, if any one of Plaintiffs' claims provides an equitable hook for subject matter jurisdiction, then this court *may* choose to exercise jurisdiction over the legal claims as well.

There is no question that Count II, alleging that Lucchino breached his fiduciary duties to Plaintiffs, is the "quintessential equitable claim."[68] If adequately pleaded, this claim would provide the court with a basis to assert subject matter

---

[65] *Id.* at 4–7.

[66] Compl. ¶¶ 117–134; Dkt. 26 at 13–14; Dkt. 29 at 9.

[67] Pls.' Supp. Memo. at 7–8; Defs.' Supp. Memo. at 8–9.

[68] Pls.' Supp. Memo. at 4 (citing *Prospect St. Energy, LLC v. Bhargava*, 2016 WL 446202, at *4 (Del. Super. Ct. Jan. 27, 2016)); Defs.' Supp. Memo. at 3.

14

jurisdiction. If this claim is deemed facially invalid, then subject matter jurisdiction will hinge on the nature of the relief sought in the remaining claims. The court therefore begins its analysis with this sole equitable claim.

## A. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (cleaned up). At this early stage, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)). "Although the standard is a minimal one, the Court will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiff." *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) (cleaned up).

15

## B. The Complaint Does Not State a Claim Against Lucchino for Breach of Fiduciary Duty

Plaintiffs allege that Lucchino breached his fiduciary duty of loyalty through his wrongful actions contributing to the delay in the transfer of Plaintiffs' stock.[69] In support of this allegation, Plaintiffs focus on the profits Lucchino made in his stock sales from February 1–8 and on March 1, 2021, which coincided with Plaintiffs' efforts to transfer their shares.

Plaintiffs' sole claim against Lucchino alleges that "[his] actions to prevent the Trusts from selling their shares at a time when he was personally selling shares under a 10b-5-1 plan, served to benefit him personally." Compl. ¶ 109. This claim is factually unsupported. The reader of the Complaint is left to guess what "actions" Lucchino took to prevent the Trusts from selling their shares. The Complaint does not allege any well-pleaded fact to infer that Lucchino had anything to do with Plaintiffs' inability to transfer their shares. All of the allegations concerning Plaintiffs' transfer woes involve communications between Plaintiffs' broker and Computershare. There is not a single allegation that Lucchino had any communication, directly or indirectly, with Computershare at any time between February 1 and March 24, 2021. There is no allegation that Lucchino was informed about Plaintiffs' ordeal with Computershare in February or March 2021 or at any

---

[69] Compl. ¶ 109.

16

time prior to his reading the Complaint. There is no allegation that Lucchino knew that Plaintiffs had sought to sell or transfer their stock in February or March 2021. Indeed, there is no allegation in the Complaint that Lucchino even knew of the Plaintiffs' existence.

The Plaintiffs' reference to Lucchino's stock sales are nothing more than a diversion from their inability to connect Lucchino to the Plaintiffs and their brokers' communications with Computershare. Plaintiffs are essentially attempting to transmogrify a state-law insider trading claim under *Brophy* into an individual claim. Plaintiffs disclaim doing so,[70] but that is the only conclusion to be drawn from the allegations of the Complaint. To wit, the Complaint alleges that on January 13, 2021, Lucchino "was possibly aware" that the results of the Company's ongoing clinical study "would not be positive." Compl. ¶ 42. Plaintiffs allege that, by January 27, 2021, Lucchino was "likely aware" that the results of the Phase 2a study "would not be positive." *Id.* ¶ 45. Plaintiffs conclude that, by February 22, 2021, Lucchino "had to have been keenly aware" that the results would be "highly disappointing" and that the Company's share price would fall once this news was

---

[70] Transcript at 40 (Plaintiffs' counsel: "So the reason why it's not a *Brophy* claim is because what we're focusing on is [Lucchino's] frustration of the Parseghians. That's the key. That's the heart of it. And that's what I think paragraph – that was certainly the intention of paragraph 109, was that – 'Lucchino's actions to prevent the Trusts from selling their shares,' that's the wrongful conduct." (quoting Compl. ¶ 109)).

17

released.  *Id.* ¶ 47.  Plaintiffs then seemingly try to tie Lucchino's stock sales on February 1, 2, 3 and 8 and March 1, 2021 to the Plaintiffs' inability to convince Computershare to transfer their Frequency shares:[71]

> Lucchino's actions to prevent the Trusts from selling their shares at a time when he was personally selling shares under a 10b-5-1 plan, served to benefit him personally. While Frequency also benefited from the temporary increase in share price (as well as any other selling insiders), Lucchino personally gained $3,557,666.12 in profits.

Compl. ¶ 109.

This is a non-sequitur.  As explained above, Plaintiffs' direct claim that Lucchino thwarted Plaintiffs' efforts to transfer their shares is without any factual support.  Count II, at best, is framed as a *Brophy* claim.  Even viewed as a *Brophy* claim, however, this count must be dismissed.  Insider trading claims under *Brophy* are derivative.  *See Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) ("A *Brophy* claim is fundamentally derivative in nature, because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation."); *see also In re Vaxart, Inc. Stockholder Litig.*, 2021 WL 5858696, at *22 (Del. Ch. Nov. 30, 2021) ("This court treats as derivative *Brophy*

---

[71] Compl. ¶¶ 55, 57–58, 60, 63–64, 95.

claims alleging that a fiduciary possessing material, nonpublic information breached her fiduciary duties by trading on that information.").

To pursue a *Brophy* claim against Lucchino, Plaintiffs must allege well-pleaded facts to excuse demand. Under Court of Chancery Rule 23.1, Plaintiffs must "plead with particularity facts showing that a demand on the board would have been futile." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing Ct. Ch. R. 23.1(a)). Plaintiffs acknowledge that they have not made any demand on Frequency's board of directors to institute litigation against Lucchino, and they do not attempt to argue that demand would be futile. Accordingly, Count II is dismissed with prejudice.

## C. Does the Court Have Subject Matter Jurisdiction over the Remaining Claims?

Having dismissed Count II on the merits, the court turns to the question it raised on its own at oral argument: Does the court have subject matter jurisdiction over any of the remaining claims? The parties urge the court to keep the case. The parties admit that Counts IV–VI are legal claims for negligence. Nevertheless, the parties insist that Counts I and III are either equitable in nature or seek equitable relief.

"The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." 10 *Del. C.* § 342. "When examining its own

19

jurisdiction, this Court must honor the first obligation of a limited-jurisdiction court: modesty." *Elavon, Inc. v. Elec. Transaction Sys. Corp.*, 2022 WL 667075, at *2 (Del. Ch. Mar. 7, 2022). "Chancery jurisdiction is not conferred by the incantation of magic words." *McMahon v. New Castle Associates*, 532 A.2d 601, 603 (Del. Ch. 1987). Nor may the parties confer subject matter jurisdiction by consent or agreement. *El Paso*, 669 A.2d at 39. "Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will itself excuse the court . . . from a realistic assessment of the nature of the wrong alleged and the remedy available . . . ." *McMahon*, 532 A.2d at 603. "If a realistic evaluation leads to the conclusion that an adequate legal remedy is available this court, in conformity with the command of section 342 of title 10 of the Delaware Code will not accept jurisdiction over the matter." *Id.* Acknowledging these important principles, this court turns to the only claims remaining with purported foundations in equity, Counts I and III.

### 1. Count I: Conversion

Count I asserts that Frequency and Computershare "took wrongful actions that prevented the Trusts from selling their positions . . . until after the price had collapsed to 43% below its initial offering price."[72] Plaintiffs argue that the court has subject

---

[72] Compl. ¶ 102.

matter jurisdiction over this claim because it seeks an equitable remedy.[73] The Complaint belies that assertion.

The tort of conversion is typically viewed as a legal claim. *See FirstString Research, Inc. v. JSS Med. Research Inc.*, 2021 WL 2182829, at *3 (Del. Ch. May 28, 2021) (holding that plaintiff's conversion claim was a tort claim "that [is] legal in nature"); *GWO Litig. Tr. v. Sprint Sols., Inc.*, 2018 WL 5309477, at *11 (Del. Super. Oct. 25, 2018) (holding that conversion is an intentional tort for which a legal remedy exists); *Spano v. Morse*, 2003 WL 22389542, at *1 (Del. Ch. Oct. 8, 2003) (holding that a claim for conversion was a legal claim). To invoke subject matter jurisdiction in this court for a claim for conversion the claim must: (i) involve the wrongdoing of a fiduciary; or (ii) seek damages that are difficult to assess or relief that is equitable in nature. *Int'l. Bus. Machs. v. Comdisco, Inc.*, 602 A.2d 74, 78, 81 (Del. Ch. 1991). Absent a showing of one of these two special circumstances, a claim for conversion will be deemed legal and not equitable. *See Cartanza v. Cartanza*, 2012 WL 1415486, at *5–6 (Del. Super. April 16, 2012) (contrasting its jurisdiction over "typical conversion claims" with the Court of Chancery's jurisdiction over conversion claims involving the special factors highlighted in *Comdisco*).

---

[73] Pls.' Supp. Memo. at 4–5.

21

Plaintiffs' claim for conversion fails to meet either of the required circumstances to confer jurisdiction in equity. Plaintiffs cannot allege a wrongdoing of a fiduciary because they do not allege a fiduciary relationship with either Computershare or Frequency.[74] Plaintiffs also do not allege that their damages are too complicated to calculate. To the contrary, their own Complaint expressly articulates the formula to compute Plaintiffs' damages: "the proper measure of damages is the value of the Trusts' position at its intraday trading zenith . . . less the value of the shares on March 24, 2021."[75] In *Comdisco*, this court rejected the argument that damages for the conversion of several pieces of computer equipment

---

[74] It is well established that a corporation does not owe fiduciary duties to its stockholders. *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014). Plaintiffs concede this point. Compl. ¶ 116 ("[T]he company itself does not owe its shareholders fiduciary duties."). The Complaint does not allege that Computershare owed fiduciary duties to the Plaintiffs. Plaintiffs also cannot rely on any fiduciary relationship with Lucchino to support an equitable hook to this claim. Although the allegations in the body of Count I refer to "Frequency, *Lucchino*, and Computershare," Compl. ¶¶ 102, 103 (emphasis added), the headline to Count I states that it is a claim for conversion only "against Frequency and Computershare, jointly and severally," Compl. at 24. In their briefing, Plaintiffs confirmed that the header accurately described the defendants subject to this claim: "Count I alleges a conversion claim against Frequency and Computershare, but not Lucchino." *See* Dkt. 27 at 10 n.3. In any event, as explained above, the Complaint contains no allegation that Lucchino took any action concerning the Trusts' attempts to transfer their stock. Therefore, Plaintiffs are unable to rely upon Lucchino's actions "as the wrongdoing of a fiduciary" to provide an equitable element to their conversion claim.

[75] Compl. ¶ 105. In their Supplemental Submission, Plaintiffs reverse course, relying on cases accepting jurisdiction over a conversion claim where the court found damages "incalculable." Pls.' Supp. Memo. at 5 (citing cases). Plaintiffs cannot amend their Complaint through their brief. *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) ("Arguments in briefs do not serve to amend the pleadings.").

22

would be so difficult to quantify as to render any legal remedy incomplete. *Comdisco*, 602 A.2d at 79. Instead, the court found that once plaintiff proved the value of each item converted, "all that [would be] left for the trier of fact is simple addition, a task that would not appear to be more difficult for a lay juryman than for a vice chancellor." *Id.* The simple damages calculation that Plaintiffs posit resembles the simple addition in *Comdisco*, which the court considered an adequate remedy at law.[76] Based on a realistic evaluation of Count I, the Court concludes that an adequate remedy at law is available. Accordingly, Count I is a legal claim seeking a legal remedy over which this court lacks subject matter jurisdiction.

## 2. Count III: Unjust Enrichment

Plaintiffs' unjust enrichment claim is asserted only against Frequency. It seeks only money damages. In *Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010), the Court articulated the elements of unjust enrichment as: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.* at 1130.

Unjust enrichment is a traditionally legal claim. *Garfield on behalf of ODP Corp. v. Allen*, 2022 WL 1641802, at *42 (Del. Ch. May 24, 2022). The fifth

---

[76] *Comdisco*, 602 A.2d at 79. The court expresses no opinion as to Plaintiffs' ability to establish damages or the viability of their conversion theory.

element is not actually an element of the claim, but rather, an element that must be satisfied to obtain equitable jurisdiction over an unjust enrichment claim. Indeed, the "no adequate remedy at law" element developed to identify a basis for the assertion of equitable jurisdiction specifically because this claim "did not arise in equity and was not a purely equitable claim." *Id.* at *42. Therefore, "[i]f a plaintiff seeks to pursue a claim for unjust enrichment in the Court of Chancery and has no other basis for equitable jurisdiction, then the plaintiff must establish the absence of a remedy at law to establish equitable jurisdiction." *Id.* at *44.

The Plaintiffs have not attempted to establish that their unjust enrichment claim lacks an adequate remedy at law so as to confer jurisdiction in this court. To the contrary, Plaintiffs' requested relief is solely money damages. Plaintiffs seek a monetary award "not less than $3,611,641.40 calculated as the difference between: (1) the value of the Trusts' [shares] at its intraday trading zenith . . . and (2) the value of the Trusts' [shares] as of March 23, 2021."[77]

Plaintiffs' Count III mentions the imposition of a constructive trust in its header, yet the Complaint contains no allegations supporting or even mentioning such a remedy. Indeed, imposition of a constructive trust is not a remedy listed in the Complaint's prayers for relief. "The party seeking an equitable remedy has the

---

[77] Compl. Wherefore Clause ¶ A.

burden to show that a legal remedy would be inadequate." *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *2 (Del. Ch. May 28, 2004).

"A constructive trust is one imposed by a court of equity as a remedy to correct the unlawful vesting, or assertion of, legal title." *Triton Const. Co. v. E. Shore Elec. Servs., Inc.,* 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) (quoting *E. Lake Methodist Episcopal Church, Inc. v. Trs. of Peninsula-Del. Annual Conf. of the United Methodist Church, Inc.,* 731 A.2d 798, 809 n.4 (Del. 1999)). "A constructive trust may be imposed upon specific property [or] identifiable proceeds of specific property, and even money so long as it resides in an identifiable fund to which the plaintiff can trace equitable ownership." *B.A.S.S. Gp., LLC v. Coastal Supply Co.,* 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (internal quotation omitted). Thus, a constructive trust, not premised on an equitable right, will not succeed in conferring equity jurisdiction unless it relates to specific property or identifiable proceeds of specific property. *McMahon,* 532 A.2d at 609; *accord Metro Ambulance, Inc. v. E. Med. Billing, Inc.,* 1995 WL 409015, at *4 (Del. Ch. July 5, 1995).

At this stage, the court is instructed to examine a plaintiff's pleadings to "determine the true substance of the relief [sought]." *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *3 (Del. Ch. Dec. 8, 2017) (quoting *E.I. du Pont de Nemours & Co. v. Bayer Crop., L.P.*, 2008 WL 2673376, at *2 (Del.

Ch. July 2, 2008)), *order clarified*, (Del. Ch. 2018).[78] In its determination, the court shall "not be bound by the form of relief as described [by the plaintiff]." *Id.* "A Court must examine what has been alleged in the pleadings, not what a plaintiff believes has been alleged." *Gabelli & Co., Inc. v. Liggett Grp., Inc.*, 1983 WL 18015, at \*3 (Del. Ch. Mar. 2, 1983), *aff'd*, 479 A.2d 276 (Del. 1984*)*.

Plaintiffs' single, unadorned use of the term "constructive trust" does not open the doors of this court to an unjust enrichment claim seeking money damages. *See Comdisco*, 602 A.2d at 78 ("[A] judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery.") Plaintiffs are not seeking restoration of title to specific property or identifiable proceeds of specific property. Plaintiffs are seeking money damages. Therefore, Plaintiffs have an adequate remedy at law as to Count III. Accordingly, the court lacks subject matter jurisdiction over the unjust enrichment claim.

---

[78] *See also Medek v. Medek*, 2008 WL 4261017, at \*3 (Del. Ch. Sept. 10, 2008) ("In deciding whether or not equitable jurisdiction exists, the Court must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim. In other words, 'the court must address the nature of the wrong alleged and the available remedy to determine whether a legal, as opposed to an equitable remedy, is available and sufficiently adequate.'" (footnote and citation omitted)).

### 3. Counts IV–VI: Negligence

Plaintiffs do not allege that Counts IV–VI assert equitable claims or seek equitable remedies. Indeed, Counts IV–VI are legal claims, sounding in tort,[79] that may be remedied by an award of monetary damages.

Acknowledging this, Plaintiffs argue that this court should still retain jurisdiction over these claims, even if it chooses to dismiss any equitable claims, in order "to avoid multiplicity of suits, promote judicial efficiency, avoid expense, and afford complete relief in one action."[80] As discussed below, this decision rests in the court's discretion.

### D. The Court Declines to Retain Jurisdiction Under the Clean-Up Doctrine

This court is permitted to exercise ancillary jurisdiction under the clean-up doctrine "to resolve purely legal causes of action that are before it as part of the same controversy over which the Court originally had subject matter jurisdiction in order to avoid piecemeal litigation." *Kraft v. WisdomTree Investments, Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016). This court has described the policies underlying the clean-up doctrine as follows:

> Some of the reasons why equity, once having acquired jurisdiction over part of a controversy, will, in the Court's discretion, continue to exercise jurisdiction over the entire controversy, even over those portions where

---

[79] *Wollard v. Yoder & Sons Constr., LLC*, 2021 WL 141984, at *1 (Del. Ch. Jan. 15, 2021).

[80] Pls.' Supp. Memo. at 8.

there is an adequate remedy at law are: to resolve a factual issue which must be determined in the proceedings; to avoid multiplicity of suits; to promote judicial efficiency; to do full justice; to avoid great expense; to afford complete relief in one action; and to overcome insufficient modes of procedure at law.

*Getty*, 385 A.2d at 150 (citation omitted); *accord FirstString Research, Inc.*, 2021 WL 2182829, at *6.

In this case, the Plaintiffs' sole equitable claim has been dismissed for failure to state a claim. The absence of any factual allegations to support a direct claim for breach of fiduciary strongly suggests that Count II was a thinly veiled attempt to manufacture subject matter jurisdiction for otherwise legal claims. Where, as here, the only claims for which this court had subject matter jurisdiction are dismissed at an early stage in the proceedings, it is appropriate to decline jurisdiction under the clean-up doctrine. *Rizzo ex rel. JJ&B, LLC v. Joseph Rizzo & Sons Const. Co.*, 2007 WL 1114079, at *2 (Del. Ch. Apr. 10, 2007). To do otherwise in these circumstances would be inviting litigants to confer subject matter jurisdiction through the assertion of specious equitable claims.

Plaintiffs' claims of conversion and unjust enrichment assert legal rights, "ultimately seek[] a monetary award, the quintessential legal remedy,"[81] and otherwise fail to vest this court with subject matter jurisdiction. Plaintiffs' sole

---

[81] *Bancorp Bank v. Cross & Simon, LLC*, 2015 WL 2209539, at *2 (Del. Ch. May 8, 2015).

equitable claim, for breach of fiduciary duty, is inadequately pleaded and fails on its face. The three remaining claims are concededly legal claims sounding in negligence.

Acknowledging its role as a limited-jurisdiction court, this court is not persuaded to exercise jurisdiction over the surviving legal claims. This case is only at the pleadings stage. *See Rizzo*, 2007 WL 1114079, at *2 ("[J]udges of this court are more reluctant to exercise discretionary jurisdiction over legal claims after the equitable claims have been resolved or have become moot, especially when those claims are resolved at an early stage, such as by a motion to dismiss."). Declining jurisdiction will not result in duplicative litigation in two courts or great additional expense. At this early stage, the legal claims that remain in this case should be litigated where they belong, in a court of law.[82] Because "there are no remaining

---

[82] In their Answering Brief in Opposition to Computershare's Motion to Dismiss, Plaintiffs argued that Computershare is also liable under 6 *Del. C.* §§ 8-503, 8-505–8-508. Dkt. 26 at 4, 14–15. Plaintiffs asserted no such statutory claim in their Complaint, and the Complaint did not even reference these statutory provisions. "Plaintiff's counsel's *post hoc* attempt to clarify the allegations in the Complaint in response to a motion to dismiss, while understandable given the paucity of the Complaint, cannot be received as a supplement or amendment to the pleading itself." *Akrout v. Jarkoy*, 2018 WL 3361401, at *3 n.23 (Del. Ch. July 10, 2018). Delaware law does not permit plaintiffs to amend their complaint through briefing. *Coulter*, 2002 WL 31888343, at *12; *see also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010) ("[Plaintiff] could either seek leave to amend its complaint or stand on its complaint and answer the motion to dismiss."); *see also Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 n.36 (Del. Ch. Aug. 9, 2017) (disregarding facts alleged for the first time in briefing). This restriction naturally extends to attempts at recasting the allegations occurring at oral argument governing the motions

equitable claims upon which this Court's jurisdiction may be premised, there is no basis for retaining jurisdiction over any legal claim." *Kennett v. Carlyle Johnson Mach. Co.*, 2002 WL 1358755, at *7 (Del. Ch. June 17, 2002); *see also* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.04, at 2-86 (2d ed. 2021) (noting that the court is more likely to decline to exercise jurisdiction under the clean-up doctrine "where the equitable claims have fallen away, at least where the proceedings have not progressed to the point where prejudice and inefficiency would result from discontinuing the pending proceeding.").

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Count II is GRANTED for failure to state a claim. The remaining claims are dismissed for lack of subject matter jurisdiction, subject to Plaintiffs' right to elect under 10 *Del. C.* § 1902 to have those claims transferred to the Superior Court of Delaware.

**IT IS SO ORDERED.**

---

to dismiss. *See Harcum v. Lovoi*, 2022 WL 29695, at *12 n.139 (Del. Ch. Jan. 3, 2022) ("Just as a plaintiff may not amend her complaint through her brief, she may not do so at oral argument." (citation omitted)). Accordingly, these arguments are improper and will not be considered.